UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

**GREGORY HELSINGER,**

    Plaintiff,

    v.                               Case No. 20-CV-1015

**KILOLO KIJAKAZI,**
Acting Commissioner of Social Security[1],

    Defendant.

---

### DECISION AND ORDER

---

Gregory Helsinger seeks judicial review of the final decision of the Commissioner of the Social Security Administration denying his claim for a period of disability and disability insurance benefits and a Title XVI application for supplemental security income under the Social Security Act, 42 U.S.C. § 405(g). For the reasons below, the Commissioner's decision is reversed and the case will be remanded for further proceedings consistent with this decision pursuant to 42 U.S.C. § 405(g), sentence four.

### BACKGROUND

#### 1. *Relevant Medical History*

On July 6, 2015, Helsinger filed a Title II application for a period of disability and disability insurance benefits, as well as a Title XVI application for supplemental security income, alleging disability beginning on February 21, 2014 due to migraines and back

---

[1] The court has changed the caption to reflect Kilolo Kijakazi's appointment as acting commissioner. *See* Fed. R. Civ. P. 25(d).

problems. (Tr. 14, 228, 853.) Helsinger challenges the ALJ's evaluation of his migraine headaches only.

In February 2012, Helsinger fell three days in a row while walking on an icy sidewalk, hitting the back of his head. (Tr. 664.) Helsinger states that he began experiencing chronic daily headaches after the falls. (Tr. 396.) However, by late 2014, Helsinger reported an increase in the frequency and intensity of his headaches. (Tr. 371.) In February 2015, Helsinger sought treatment for his chronic headaches with osteopath Dr. Brett Wilson. (*Id.*) At that time, he reported an increase in frequency of headaches in the past two and a half months, with "some features of migraines." (*Id.*) Helsinger stated that his current headaches were becoming almost daily and were "quite variable in intensity," but when the headaches were more intense, they produced more migraine-like symptoms. (Tr. 372.) Helsinger reported having nausea and photophobia on occasion. (*Id.*) Dr. Wilson noted that Helsinger had recently reduced his caffeine intake from a previous "fairly substantial" amount; thus, he found "reason to suspect that some of his headaches may be caffeine withdrawal-type headaches." (*Id.*)

In May, Helsinger reported having a headache that lasted for 7-10 days, gradually worsened, and was exacerbated by bright light. (Tr. 370.) In June, Helsinger reported experiencing "fairly constant" stabbing headaches, often with photophobia and phonophobia, but with little or no nausea. (Tr. 369.) His treating physician, Dr. Daniel Landdeck, recommended monitoring the headaches and starting tramadol for pain.[2] (*Id.*)

---

[2] Tramadol is a medicine used to treat moderate to severe pain in adults and is similar to an opioid. It acts in the central nervous system to relieve pain. https://www.drugs.com/tramadol.html (last visited Feb. 8, 2022).

2

In early July 2015, Helsinger presented to Dr. Landdeck with recurring headaches, made worse with sun or light exposure. (Tr. 427.) Dr. Landdeck recommended Helsinger take a low dose of amitriptyline,[3] but Helsinger declined. (*Id.*) In late July, Helsinger reported to Dr. JoAnn Lee that his headache issues had been severe for the last two years. (Tr. 423.) He stated that he is light-sensitive and will get a headache if he fails to wear sunglasses. (*Id.*) Helsinger indicated that when his headaches get really bad all he can do is sleep and that his headaches have gotten steadily worse. (*Id.*) Helsinger reported that he tried taking gabapentin for pain, but it did not help. (*Id.*) While the tramadol "takes the edge off" the pain, it only lasts about half an hour. (*Id.*)

In late August, 2015, Helsinger reported to Dr. Lee that he continued to have "pretty severe" headaches, worse during the day, that were exacerbated by smoke and gas fumes. (Tr. 419.) Helsinger reported that sound and light also worsened the headaches. (*Id.*) Helsinger requested a stronger pain medication than tramadol; however, Dr. Lee suggested constant use of the medication may be making the tramadol less effective and recommended reducing the medication for the next week to see if it became effective for him again. (*Id.*) In September, Helsinger reported having difficulty doing anything on the computer because it worsened his headaches. (Tr. 418.) A week later, Helsinger treated with Dr. Lee and stated that the headaches continued, but that the tramadol had done more for his pain than hydrocodone. (Tr. 416.) Helsinger was proscribed Percocet for pain. (*Id.*) By late September, Helsinger's headaches remained unchanged. (Tr. 415.)

---

[3] Amitriptyline is a prescription medicine used to treat symptoms of depression. https://www.drugs.com/amitriptyline.html (last visited Feb. 8, 2022). However, amitriptyline is sometimes prescribed off-label at low doses to prevent migraine attacks. https://www.healthline.com/health/migraine/amitriptyline-migraine (last visited Feb. 8, 2022).

On November 16, 2015, Helsinger attended a consultation with neurology physician's assistant Kristina Trybek regarding his headaches. (Tr. 396.) He reported having 30 severe headaches per month, with accompanying symptoms of photophobia, osmophobia, nausea, vomiting, blurry vision, tingling, sweating, lightheadedness, vertigo, difficulty thinking, and fatigue. (*Id.*) While Helsinger used Diclofenac[4] in the past as an abortive medication for the headaches, he found it ineffective and stopped using it. (*Id.*) Further, he was not using any preventative medications. (*Id.*) A occipital nerve block was performed (Tr. 395), providing almost instant pain reduction from an 8/10 to a 2/10 (Tr. 398). The physician's assistant opined that Helsinger's "chronic daily migraines" seemed to be "provoked by occipital nerve irritation," perhaps caused by the prior head trauma. (*Id.*) She recommended physical therapy and additional nerve blocks to treat the pain. (*Id.*) In December, Helsinger reported to Dr. Lee that his headaches were "the same as they have been." (Tr. 414.)

On February 26, 2016, Helsinger again treated with PA Trybek for headaches. (Tr. 830.) Helsinger reported that his chronic daily headaches were the same since November, that he stopped taking Nortriptyline[5] because it was not working, and that the nerve block only lasted a few hours. (*Id.*) Helsinger was prescribed amitriptyline and lidocaine ointment for his headaches. (Tr. 832.)

On May 16, 2016, Helsinger presented to the emergency room with a migraine, dizziness, photophobia, and nausea. (Tr. 651.) He stated that he was taking metoprolol[6] and

---

[4] Diclofenac is a nonsteroidal anti-inflammatory drug (NSAID) used to treat mild to moderate pain. https://www.drugs.com/diclofenac.html (last visited Feb. 8, 2022).
[5] Nortriptyline is a tricyclic antidepressant. Though typically used to treat depression, there is "some evidence" it can also be beneficial in treating migraine. https://www.healthline.com/health/nortriptyline-migraine (last visited Feb. 8, 2022).
[6] Metoprolol is a beta-blocker used prophylactically in treating migraines. https://pubmed.ncbi.nlm.nih.gov/18184294/(last visited Feb. 8, 2022).

amitriptyline without any change in symptoms, except increased phonophobia. (*Id.*) Helsinger reported that his current migraine was "consistent with previous migraine headaches" and "not the worst of his life" (Tr. 651, 656), but was prolonged for the last four days "intractable in regards to the medications he [was] taking at home" (Tr. 656).

On June 22, 2016, Helsinger saw Dr. Gurkit Miranpuri to establish care. (Tr. 514–15.) Helsinger reported left-sided temporal headaches with sensitivity to light, noise, and smells. (Tr. 515.) He continued to take amitriptyline (Tr. 515) and at that appointment, denied having a headache (Tr. 516). Dr. Miranpuri referred Helsinger for an evaluation with neurologist Dr. Steven Sandstrom regarding Helsinger's headaches. (Tr. 664.) On August 28, Dr. Sandstrom noted that Helsinger's headaches get progressively worse throughout the day and are aggravated by smells and lights. (*Id.*) His "daily headache" had gotten progressively worse in the past two years and sometimes caused blurry vision and brief loss of consciousness. (*Id.*) Helsinger stated that while the amitriptyline helped with sleep, it did not ease his headaches. (Tr. 665.) Similarly, gabapentin and topiramate[7] provided no relief and the occipital nerve block's relief was only temporary. (*Id.*) Dr. Sandstrom found no intracranial pathology causing his headaches, and recommended discontinuing amitriptyline and taking a higher dose of topiramate. (Tr. 669.)

On January 4, 2017, Helsinger treated with Dr. Miranpuri and reported that after seeing the neurologist he began taking Lamictal and Imitrex[8], but had not noticed much difference in his headaches. (Tr. 526.) In March, Dr. Miranpuri noted that Helsinger was

---

[7] Topiramate in an antiepileptic drug used for the prevention of migraine headache in adults. https://www.aafp.org/afp/2005/1015/p1563.html(last visited Feb. 8, 2022).
[8] Lamictal is an antiepileptic drug, https://www.drugs.com/search.php?searchterm=Lamictal (last visited Feb. 8, 2022) and Imitrex is a headache medicine used to treat migraine symptoms, https://www.drugs.com/search.php?searchterm=Imitrex&sources%5B%5D=(last visited Feb. 8, 2022).

5

"established with neurology and is on appropriate medications" and that Helsinger "states that his headaches are well-controlled however he is requesting a form to be signed today . . . stating that he is unable to work due to his headaches." (Tr. 530.) Dr. Miranpuri informed Helsinger that if needed a letter stating that he was unable to work due to headaches, it should come from the neurologist. (Tr. 532.) Dr. Miranpuri noted that "[i]mmediately after I said this he was [sic] got very loud and angry and walked out of the room stating that he wanted a different primary physician." (*Id.*)

On August 22, 2017, Helsinger again treated with Dr. Sandstrom and stated that his headaches "have not gotten better." (Tr. 719.) Helsinger continued to be "very photophobic," tried to only go out in the evening, and wore sunglasses when outside. (*Id.*) Helsinger began taking Propranolol[9] which initially lessened his pain, but it "wore off." (*Id.*) Helsinger reported having 90 days of headaches in the last three months. (*Id.*) Dr. Sandstrom increased Helsinger's Propranolol dose, prescribed tinted glasses for his photophobia, and recommend Botox injections and another occipital nerve block. (Tr. 723.) On September 22, 2017, Helsinger presented to the emergency room for evaluation of a headache and left lip numbness. (Tr. 689.) The emergency room notes state that Helsinger described his headaches as "intermittent" for the last four years and was taking Propranolol and Imitrex. (*Id.*) Dr. Sandstrom was consulted, and he recommended following-up with a Botox injection and again increasing the Propranolol. (Tr. 694.)

Dr. Sandstrom referred Helsinger to neurologist Dr. Wilson Luy Tan for a second opinion in the management of his chronic headaches and "for possible consideration of Botox

---

[9] Like Metoprolol, Propranolol is also a beta-blocker used prophylactically in treating migraines. https://www.drugs.com/search.php?searchterm=Propranolol&sources%5B%5D=(last visited Feb. 8, 2022).

injection therapy for chronic migraine." (Tr. 734.) On December 5, 2017, Dr. Tan noted that Dr. Sandstrom had twice scheduled Helsinger for Botox injections with Dr. Tan, but Helsinger failed to come in for the procedure. (*Id.*) Dr. Tan opined that Helsinger's headaches were "nonorganic," in other words, psychogenic, and recommended he be evaluated by Behavioral Health for his "pseudo-neurologic issues." (Tr. 737.)

Helsinger treated with neurologist Dr. Robert Jones on December 22, 2017. (Tr. 838.) Helsinger reported to Dr. Jones that his headaches occurred daily and typically lasted hours. (Tr. 839.) He described the pain as "bothersome" and "interfere[d] with [his] general wellness." (*Id.*) While Dr. Jones noted insufficient time to define a clear pattern of Helsinger's headaches, he believed their character suggested migraines. (Tr. 840.) On March 15, 2018, Helsinger reported to Dr. Jones pounding headaches with nausea the entire prior week. (Tr. 1121.) At this time, Helsinger was taking Duloxetine and Dr. Jones noted his headaches as "unchanged." (Tr. 1122.)

Throughout the remainder of 2018, Helsinger continued to report chronic migraines without much relief. (Tr. 1118–19, 1237.) In December, Helsinger reported to Dr. Jones that his headaches were "about the same" and "stable" since September. (Tr. 1116.) Helsinger continued to report blurry vision and light and noise sensitivity. (*Id.*) Dr. Jones described Helsinger's headaches as "mildly improved," stating that "Tizanidine and duloxetine seemed to have helped."[10] (Tr. 1117.)

By 2019, Helsinger's treatment shifted from headaches to low back pain. In both April and May, Helsinger treated with pain management physician Dr. Mansoor Aman. (Tr. 1402,

---

[10] Duloxetine is an anti-depressant, https://www.drugs.com/search.php?searchterm=Duloxetine&sources%5B%5D=(last visited Feb. 8, 2022), and Tizanidine is a muscle relaxer, https://www.drugs.com/search.php?searchterm=Tizanidine&sources%5B%5D=(last visited Feb. 8, 2022).

7

1447.) At both appointments, while Dr. Aman noted that Helsinger suffered from chronic tension headaches, he stated Helsinger's "most significant concern" was his low back pain (Tr. 1402, 1447.) Helsinger further denied having a headache at both appointments. (*Id.*) Similarly, in February 2020, Helsinger treated with Dr. Robert Geck and stated that he continued to experience "intermittent" headaches that were exacerbated by direct sunlight exposure. (Tr. 1600.) At the April 15, 2020 hearing, Helsinger testified that he continued to take Propranolol for his headaches and stated that if he forgets to take it, his migraines get really bad, but "otherwise they are under control to the point where I can kind of deal with my migraines." (Tr. 896.)

    2.    *Procedural History*

Again, Helsinger filed a Title II application for a period of disability and disability insurance benefits, as well as a Title XVI application for supplemental security income, alleging disability beginning on February 21, 2014 due to migraines and back problems. (Tr. 14, 228, 853.) Helsinger's applications were denied initially and upon reconsideration. (Tr. 14.) Helsinger filed a request for a hearing, and a hearing was held before an Administrative Law Judge ("ALJ") on January 24, 2018 (Tr. 38–79.) In a written decision issued April 23, 2018, the ALJ found that Helsinger had the severe impairments of degenerative disc disease, migraine headaches, and diabetes mellitus. (Tr. 17.) The ALJ found that Helsinger did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1 (the "Listings"). (Tr. 19–20.) The ALJ further found that Helsinger had the residual functional capacity ("RFC") to perform sedentary work, with the following limitations: avoid exposure to irritants such as fumes, odors, dust, and gases; avoid exposure to unprotected heights, hazards, and moving

machinery; unable to climb ladders, ropes, and scaffolds; and is limited to occasional stooping, crouching, kneeling, crawling, and climbing ramps and stairs. (Tr. 20.) While the ALJ found that Helsinger was unable to perform his past relevant work, he determined that given Helsinger's age, education, work experience, and RFC, other jobs existed in significant numbers in the national economy that he could perform. (Tr. 30–31.) As such, the ALJ found that Helsinger was not disabled from February 21, 2014, through the date of the decision (April 26, 2018). (Tr. 32.)

Helsinger subsequently requested review of the ALJ's decision to the Appeals Council, who denied his request for review on January 10, 2019. (Tr. 1–3.) Helsinger filed a complaint in federal court on March 14, 2019. (Tr. 956–59.) The parties stipulated to remand the case back to the Commissioner on October 3, 2019. (Tr. 964.) The Appeals Council issued an Order dated November 23, 2019 vacating the Commissioner's decision and remanding the case to an ALJ. (Tr. 972–74.) The Appeals Council noted that the ALJ's previous decision failed to adequately evaluate Helsinger's alleged symptoms. (Tr. 972.)

A new hearing was held on April 15, 2020. (Tr. 884–919.) Helsinger again testified, as well as Robert Verkins, a vocational expert. (Tr. 884.) In a written decision issued May 4, 2020, the ALJ again found that Helsinger had the severe impairments of degenerative disc disease of the spine, migraines, and diabetes. (Tr. 856.) The ALJ found that Helsinger did not have an impairment or combination of impairments that met or medically equaled one of the Listings (Tr. 860–61.) The ALJ further found that Helsinger had the RFC to perform sedentary work, with the following limitations: Helsinger must be allowed to change positions between sitting and standing every twenty minutes, for a few minutes, before returning to sitting or standing; must avoid exposure to irritants (fumes, odors, dusts, gases), heights,

hazards, and moving machinery; cannot climb ladders, ropes, and scaffolds; and can occasionally stoop, crouch, kneel, crawl, and climb ramps and stairs. (Tr. 861.) While the ALJ found that Helsinger was unable to perform his past relevant work, he determined that given Helsinger's age, education, work experience, and RFC, other jobs existed in significant numbers in the national economy that he could perform. (Tr. 873–76.) As such, the ALJ found that Helsinger was not disabled from February 21, 2014, through the date of the decision (May 4, 2020). (Tr. 876.) Helsinger now returns to federal court seeking review of the Commissioner's final decision denying him benefits.

## DISCUSSION

### 1. *Applicable Legal Standards*

The Commissioner's final decision will be upheld if the ALJ applied the correct legal standards and supported his decision with substantial evidence. 42 U.S.C. § 405(g); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). Substantial evidence is not conclusive evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010) (internal quotation and citation omitted). Although a decision denying benefits need not discuss every piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the conclusions drawn. *Jelinek*, 662 F.3d at 811. The ALJ must provide a "logical bridge" between the evidence and conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ is also expected to follow the SSA's rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). In reviewing the entire record, the court does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing

evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

### 2. *Application to This Case*

Helsinger argues that the ALJ erred in considering his migraine headaches at step three by failing to find that his headaches met listing 11.02 and at step five by failing to properly account for his headache-related limitations in the RFC. (Pl.'s Br. at 11, Docket # 21.) Additionally, Helsinger argues the ALJ failed to ensure that the vocational expert's testimony was based upon a reliable methodology. (*Id.* at 22–29.) I will address each issue in turn.

### 2.1 Listing 11.02

Helsinger argues that the ALJ erred in his assessment of whether his migraines are of a severity to medically equal listing 11.02. Although listing 11.02 discusses epilepsy, because there is no listing for migraines, the Commissioner routinely applies listing 11.02 when a claimant suffers from migraines. *See Jozefyk v. Saul*, No. 19-CV-1606, 2020 WL 5876063, at *3 (E.D. Wis. Oct. 2, 2020) (collecting cases). "In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing." *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004). The ALJ evaluated Helsinger's migraines under listing 11.02B and D:

> The undersigned has considered the claimant's migraines under listing 11.02. Although this listing addresses epilepsy, it is the most closely analogous listed impairment. The claimant's impairment does not meet the severity requirements of listing 11.02B or D, as there is no evidence of migraines occurring at least once a week for at least 3 consecutive months despite adherence to prescribed treatment; or occurring at least once every 2 weeks for at least 3 consecutive months despite adherence to prescribed treatment, and with a marked limitation in one of the following: physical functioning;

11

understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing oneself.

(Tr. 860–61.) A claimant can demonstrate that his migraines medically equal listing 11.02 by presenting evidence that "his migraine headaches are at least equal in severity and duration to the criteria of listing 11.02." *Corey Z. v. Saul*, No. 18 CV 50219, 2019 WL 6327427, at *4 (N.D. Ill. Nov. 26, 2019).

Helsinger has not shown that the ALJ erred in determining that his migraines did not meet listing 11.02. The Commissioner argues that the record is unclear as to what type of chronic headache Helsinger was experiencing; thus, he cannot establish a listing-level frequency of migraines. (Def.'s Br. at 9–10, Docket # 22.) Helsinger argues that the type of headache he experiences is irrelevant to the listing analysis; he asserts that as long as he experienced some type of headache at least once a week for at least three consecutive months despite adherence to treatment, the listing is met. (Pl.'s Reply Br. at 5, Docket # 24.)

Both parties' arguments miss the mark by focusing too much on the frequency of the headaches. Clearly one cannot meet a listing simply by having a "headache" once a week for three months despite adherence to treatment. "Headaches" come in all levels of intensity and under Helsinger's argument, one who experiences a mild headache once a week for three months despite regularly taking Advil would meet listing 11.02. That makes little sense. Again, a claimant must demonstrate that his headaches are equal in frequency *and* severity to the criteria of listing 11.02. *See Corey Z.*, 2019 WL 6327427 at *4; *see also* Social Security Ruling 19-4p ("While uncommon, a person with a primary headache disorder may exhibit equivalent signs and limitations to those detailed in listing 11.02 (paragraph B or D for dyscognitive

seizures), and we may find that his or her MDI(s) medically equals the listing."). As one court in this district explained:

> Although a migraine is commonly referred to as a type of headache, it cannot be said that all headaches constitute migraines. Thus, a person cannot be said to medically equal listing 11.02 merely because he suffers headaches at least once a week for three months despite treatment. Only if a person suffers headaches at that frequency *and* those headaches produce symptoms that are medically equivalent to that which attend dyscognitive seizures will a finding of medical equivalence be appropriate.

*Jozefyk*, 2020 WL 5876063, at *3 (emphasis in original).

Thus, while Helsinger may have sufficient evidence that his headaches reach the frequency for medical equivalence under listing 11.02, he has not shown that they reach the level of severity. In fact, by 2018, Helsinger sought less and less treatment for his headaches and testified in 2020 that his headaches were "under control" with his medication. (Tr. 896.) It is Helsinger's burden to show that his impairments meet or medically equal a listing. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). Helsinger has failed to do so. Thus, the ALJ did not err in this regard.

### 2.2 Headache Limitations in RFC

Helsinger further argues that the ALJ failed to adequately account for Helsinger's limitations for his migraines in the RFC. (Pl.'s Br. at 17–22.) Specifically, he argues that the ALJ did not account for Helsinger's evidence that light triggered his migraines or that his daily headaches required him the lie down by including limitations on lighting, screens, or allowing unscheduled breaks in the RFC. (*Id.* at 17–18.) Helsinger also argues the ALJ generally minimized the severity of his headaches through "flawed and distorted findings." (*Id.* at 18.)

13

As is well established, the RFC is the most that a claimant can still do despite the limitations caused by his physical and mental impairments. 20 C.F.R. § 404.1545(a)(1).[11] In this case, I agree that some of the ALJ's rationale for discounting the severity of Helsinger's headaches is flawed. The ALJ relies almost entirely on Helsinger's physical examination, where he generally exhibited good motor function, normal gait and stance, and the ability to speak and understand well. (Tr. 864–65.) But Helsinger may not have been having a migraine at the time of the examination so that the medical provider would observe his reduced physical functioning. Thus, if the ALJ was trying to discount Helsinger's allegations of disabling symptoms, he should have looked at Helsinger's waning treatment from 2018 onward and his own testimony that his headaches were under control with medication.

But the ALJ clearly did believe the Helsinger had some limitations due to headaches and limited his exposure to environmental irritants and to heights, hazards, and moving machinery to account for his migraines and corresponding dizziness associated with them. (Tr. 863.) These limitations are supported by the record. Helsinger reported to Dr. Lee that his headaches are exacerbated by smoke and gas fumes (Tr. 419) and he testified that he gets dizzy when he bends over (Tr. 896). The record also supports, however, that Helsinger's headaches are triggered by light. (Tr. 370, 396, 418–19, 423, 515, 664, 719, 839, 1119, 1600.) In fact, light seems to be the primary trigger for his headaches. Helsinger testified that light is "a big problem" for his migraines and that fluorescent light, the sun, or anything bright will trigger a migraine. (Tr. 904–05.) One provider noted that Helsinger had difficulty doing anything on the computer because it worsened his headaches and that his "ideal job would

---

[11] As the regulations governing the evaluation of disability for disability insurance benefits and SSI are nearly identical, I will generally refer to the regulations for disability insurance benefits found at 20 C.F.R. § 404.1520, *et seq.* for ease of reference.

be working a night job in a dark room." (Tr. 418.) Despite this evidence, the ALJ does not include a limitation for light in the RFC, nor does he address why he is rejecting such a limitation. Thus, remand is required on this basis.

I do not find, however, that remand is required regarding unscheduled breaks due to migraines. Helsinger argues that his headaches required him to lie down, thus necessitating unscheduled breaks and while the "ALJ did not have to adopt such limitations, he also could not simply ignore the underlying symptoms as he did in this case." (Pl.'s Reply Br. at 7–8.) But the ALJ did not ignore Helsinger's alleged need for unscheduled breaks due to migraines. Dr. Sandstrom opined that Helsinger would need to take an unscheduled break where he lies down every hour for 60 minutes. (Tr. 769.) In other words, Dr. Sandstrom opined Helsinger would need to lie down the entirety of the work day. The ALJ explained why he was rejecting this limitation as inconsistent with Dr. Sandstrom's treatment records as well as other objective medical findings. (Tr. 869–70.) The ALJ also considered Dr. Shannon's two opinions that Helsinger would require frequent unscheduled breaks, rejecting this limitation as speculative and inconsistent with the objective medical evidence. (Tr. 870–72.) The ALJ sufficiently supported his rationale as to why he was rejecting this limitation and did not err in this regard.

### 2.3 Vocational Expert Testimony Based Upon Reliable Method

Finally, Helsinger argues that the method used by the VE to arrive at his jobs estimates lacks foundation under *Chavez v. Berryhill*, 895 F.3d 962 (7th Cir. 2018) and thus the ALJ could not rely on the testimony to meet the Commissioner's burden of proof at Step Five. (Pl.'s Br. at 22–29.) Although this case is being remanded on other grounds, I will briefly address the issue.

15

At Step Five, an ALJ carries the burden in demonstrating with substantial evidence that jobs exist in significant number suitable for someone with the claimant's residual functional capacity. *Chavez*, 895 F.3d at 964. "In the context of job-number estimates, . . . the substantial evidence standard requires the ALJ to ensure the approximation is the product of a reliable method." *Id.* at 968 (citing *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002)). "Before accepting a VE's job number estimate, the ALJ, when confronted by a claimant's challenge, must require the VE to offer a reasoned and principled explanation." *Id.* at 970. This is not a formalistic exercise but a pragmatic requirement designed to ensure the reliability of the job numbers; the ALJ is not required to extensively question a VE if there are "sufficient indicia of reliability" as to the VE's testimony to support a conclusion about the applicant's ability to work. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1157 (2019).

At the hearing, Helsinger's counsel questioned the VE regarding how he estimated his job numbers. (Tr. 914.) He testified that he relies on his experience as well as the publication Occupational Employment Quarterly ("OEQ"). (*Id.*) The VE further explained that the OEQ calculates numbers by what is commonly described as the "equal distribution method." (*Id.*) The ALJ explained that he was overruling counsel's objection to the VE's methodology. (Tr. 875.)

Plaintiffs commonly challenge the VE's methodology under *Chavez*, and, as Helsinger points out, several cases are currently on appeal before the Seventh Circuit addressing a VE's reliance on numbers generated from the OEQ. (Pl.'s Br. at 26 n.4.) It is undisputed that the "equal distribution method" is flawed, as the *Chavez* court explained. 895 F.3d at 969. However, it is still a commonly used methodology by VEs and the Seventh Circuit has made clear that *Chavez* did not "enjoin the use of the equal-distribution method." *Coyier v. Saul*, 860

16

F. App'x 426, 428 (7th Cir. 2021) ("We note for completeness that *Chavez* did not enjoin the use of the equal-distribution method and created 'no new obligations' at step five; the substantial-evidence standard still governs."). Thus, while Helsinger argues that the Seventh Circuit's decision in *Brace v. Saul*, 970 F.3d 818 (7th Cir. 2020) reduces the persuasive authority of any cases relying on commonly cited VE sources, that is not exactly correct.

In *Brace*, the Seventh Circuit stated that the Supreme Court's decision in *Biestek* "explained that a vocational expert's job-number testimony will survive review under the substantial-evidence standard as long as it rests on a well-accepted methodology and the expert describes the methodology 'cogently and thoroughly.'" *Id.* at 822 (quoting *Biestek*, 139 S. Ct. at 1155). The issue with the vocational expert's testimony in *Brace* was that it was "entirely unilluminating," using "unelaborated words and phrases such as 'weighting' and 'allocation' and 'my information that I have.'" *Id.* at 822. The *Brace* court noted that while the "equal distribution method" of job estimates is often criticized, it *does* have a defined meaning. *Id.* at 823. In contrast, the VE's methodology in *Brace* was "unintelligible"—no one knows what the VE meant by words like "weighting." *Id.*

In challenging the VE's testimony in this case, Helsinger offers the following "simple example by reductio ad absurdum" to "highlight the fallacy" of the Commissioner's argument that "it is sufficient for the VE to state the source of his job numbers and answer all of the claimant's questions":

> Let us assume that a vocational expert testifies at hearing and provides job numbers. On cross-examination, counsel asks the source of the numbers. The vocational expert indicates that the number were forecasts from zodiac signed provided to him by a talking squirrel. If counsel asks about which zodiac sign was employed, the color of the squirrel, and the year of the numbers, then in accordance with the Commissioner's argument, the ALJ could accept the numbers. Does much more need to be said?

17

(Pl.'s Reply Br. at 11.) Even in preserving the issue for appeal, Plaintiffs should take care not to make arguments completely inapplicable to their case. Again, there is no doubt that the "equal distribution method" is often criticized. However, in *Chavez*, the court found that:

> And all the record shows is that the VE preferred the job-number estimates produced by the equal distribution method over those from the occupational density method. What is entirely lacking is any testimony from the VE explaining why he had a reasonable degree of confidence in his estimates. The VE, for example, could have drawn on his past experience with the equal distribution method, knowledge of national or local job markets, or practical learning from assisting people with locating jobs throughout the region, to offer an informed view on the reasonableness of his estimates. The absence of any such testimony left the ALJ without any reasoned and principled basis for accepting the job-number estimates.

895 F.3d at 969. In this case, when questioned by Helsinger's counsel, how, for example, the VE went about excluding part-time work from his job numbers, he explained his method as follows:

> Well, for the last, I hate to say it, 42 years I worked first for ten years as a vocational evaluator testing individuals to see what types of jobs they were able to do. And now for the last 32 years, I've been doing job placement. So, which allows me to get into a number of different employers to see what the, the physical demands of the jobs are. I'm working primarily with injured workers who have physical impairments. And it's necessary for me to go out to the job sites to see what the physical requirements are. So it brings me in, well with every, with every patient that's referred to us here at the hospital, I have contact with their employer.

(Tr. 915.) Thus, the VE *did* rely on his past experience and knowledge of the job market in obtaining his numbers, in addition to the OEQ. As the court recognized in *Brace*, the "equal distribution method," while flawed, does have a defined meaning. 970 F.3d at 823. And this case is a far cry from the "unintelligible," "trust me" testimony the ALJ relied on in *Brace*. While Helsinger's RFC and corresponding hypotheticals posed to the VE will likely change on remand, on this current record, the ALJ's reliance on the VE's testimony is not error.

## CONCLUSION

While Helsinger alleges multiple errors with the ALJ's decision denying him benefits, I find remand is required to address whether a limitation is warranted in the RFC to account for Helsinger's migraines being triggered by light. As such, the case is reversed and remanded for further consideration by the Administration consistent with this decision.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that the Commissioner's decision is **REVERSED**, and the case is **REMANDED** for further proceedings consistent with this decision pursuant to 42 U.S.C. § 405(g), sentence four.

**IT IS FURTHER ORDERED** that this action is **DISMISSED**. The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 8th day of February, 2022.

BY THE COURT

_____
NANCY JOSEPH
United States Magistrate Judge